Dan Manning, Appellee, v. James Kennedy et al., Appellants.

Gen. No. 42,309.

Opinion filed June 21, 1943. Rehearing denied July 14, 1943.

DAVID A. RISKIND and ABRAHAM W. BRUSSELL, both of Chicago, for appellants.

MAURICE J. WALSH and GEOFFREY FLEMING, both of Chicago, for appellee.

Plaintiff brought suit alleging that defendants had maliciously conspired to injure plaintiff by causing him to be discharged from his employment.

The complaint alleged that prior to July 5, 1938 plaintiff was a milk wagon driver and route salesman and member in good standing of the Milk Wagon Drivers' Union, Local 753, of the International Brotherhood of Teamsters of the American Federation of Labor; that Local 753 had contracts with most of the milk dealers in Chicago, including the Borden Company, by which plaintiff was employed, which provided that no person could be employed as milk wagon driver

and route salesman who was not a member of the union; that the defendants maliciously caused plaintiff to be discharged from his employment and to lose his membership in the union; that by reason of the conspiracy and loss of plaintiff's membership in the union plaintiff was discharged by the Borden Company and has ever since, by reason of the acts of the defendants, been unable to procure employment. Plaintiff asked for judgment against the defendants of $25,000.

The case went to trial before a jury, which returned a verdict finding defendants guilty and assessing plaintiff's damages at $15,000. Subsequently, upon defendants' motion for a new trial, which was denied, plaintiff remitted $7,500 from the amount of the verdict, and judgment of $7,500 was entered against the defendants, from which they appeal.

Plaintiff says the evidence shows he was a member of the Milk Wagon Drivers' Union, Local 753, for about 24 years; that he paid all his dues and in July, 1938 was not delinquent in the payment of any special assessment and had not violated any rule or by-law of the union. The by-laws of the union (section 13) provide that "All assessments and fines shall be charged as dues and must be paid within thirty days after the levying of said fine or assessment but the Executive Board may further extend the time if considered advisable." Manning was called home on May 21, 1938, due to the illness of his mother-in-law who died May 24; plaintiff remained at home for two weeks due to this illness and death; upon his return to work he was asked to pay union dues of $1.50 a week for the two weeks he was away and received no pay; he claimed that he was not required to pay for the time he did not work and was not paid, and asked a Mr. Acree, an employee of Borden Company, to obtain a ruling as to whether plaintiff was required to pay this assessment. Acree collected the dues and assessments from the members. Acree apparently never obtained

a ruling on the point made by Manning, or at least never informed Manning that he had obtained a ruling from the officials of the union.

On the morning of July 6 plaintiff brought with him a check for $10 payable to the order of the union, as he had agreed to do the day before, and offered it to defendant Richards, and then to Kennedy in payment of his dues in controversy. They refused to receive the check, although it was more than sufficient to pay all assessments levied on Manning including the two weeks he was away and not working.

Defendants argue that it was shown that plaintiff urged other members not to pay similar assessments and to disobey the union officials with reference thereto. Defendants introduced in support of this claim a witness named Sinkay, who testified that he heard Manning curse Kennedy and use abusive language toward him, urging the other employes to pay no attention to Kennedy. There were various matters which would lessen the credibility of Sinkay's testimony. Sinkay admitted that he did not know Manning. At the time of this alleged conversation Manning had the check with him to pay the assessments and would hardly curse Kennedy as Sinkay says he did, especially when Kennedy is a very large man, 6 feet tall, while Manning is a small man. The same criticism can be made of defendants' witness Swammie. He testified that when he arrived at the barn on July 6, Kennedy was asking Manning if he wanted to pay his assessments; that Manning refused, abusing Kennedy and telling the other men not to go back to work. All this happened while Manning had the check with him with which to pay the assessment. There were other witnesses present at the time and they did not testify that they heard Manning abuse Kennedy and tell the men not to pay their assessments and to pay no attention to Kennedy. In any event the testimony of these witnesses presented a question of fact,

and the jury, hearing and seeing them, evidently did not consider them credible.

The union by-laws provide as follows:

"Sec. 33. The Executive Board shall try all members whom charges have been preferred against, and report their findings at the next regular meeting of the Union.

The Executive Board should attend all meetings of the Teamsters' Joint Council.

Sec. 43. Every member of this union shall be entitled to a fair and impartial trial by the Executive Board for all offenses involving fines, suspensions or expulsion. If fined by the Business Representative, he may appeal his case to the Executive Board.

Sec. 44. No member shall be placed on trial unless charges are preferred duly specifying the grievance and submitted to the Executive Board in writing and signed by two or more members. When this is done, the Secretary-Treasurer shall so notify the accused and the witnesses to appear before the Executive Board of the union, allowing reasonable time for the accused to prepare his defense. Should the accused not appear for trial on the date specified in such notice he shall be fined, suspended or expelled as the Board may direct."

These by-laws provide that no union member shall be placed on trial unless charges are preferred against him, specifying the grievance and submitted to the Board in writing, signed by two or more members. The Executive Board shall then try all members against whom such charges have been made and report their findings at the next regular meeting of the union. All the Board had the power to do was to hear the evidence and report its findings.

It was proved beyond a doubt that the Executive Board did not observe these by-laws. It did not act on any written charge nor report its findings to the union.

There was hardly the semblance of a trial. Kennedy made a verbal statement in which he charged Manning with conduct harmful to the union; in trying to persuade members to drop out of the union. Steve Sumner, a long-time member of the Executive Board and evidently a man in whom the members had confidence, attended this meeting of the Executive Board and testified that after Kennedy said Manning would not pay his assessments a motion was made to expel him and that five of the members voted to expel him and that he (Sumner) had voted ''No.''

A motive for the charge made by plaintiff that Kennedy was scheming to punish him appears from a conversation in the spring of 1938 at a union meeting when Kennedy approached Manning and told him that he, Kennedy, was told that Manning was trying to start a movement for an election of union officers. Manning denied this and asked Kennedy who had told him this, but Kennedy made no reply. This conversation was not denied by Kennedy at the instant trial.

The union had a contract with Borden Company which provided, among other things, that if any member of the union should ''be suspended or expelled from the union for good cause, the employer agrees to discharge such person within fifteen days after receiving due notice from the officials of the Union.'' And Article 19 provides that ''Should any controversy arise not provided for in these Articles, it shall be submitted to a committee of five for arbitration, two to be selected by the first party, two by the second party, and the fifth by the first four. During such time as the matter is pending there shall be no lockout or strike. The decision of said committee to be final.''

These provisions were ignored by the defendants. Borden had not received any notice advising that Manning had been suspended or expelled. It was admitted that Kennedy called a strike in Bordens although Manning had offered his check in payment of the assess-

ments said to be due from him, which was refused with violent abuse of Manning by Kennedy. It was amply proved that it was at the instance of Kennedy that Manning was discharged. Kennedy testified that he talked with one of the officials of Borden for an hour seeking to persuade him to discharge Manning, which was finally accomplished by calling a strike on Borden.

The jury could properly find that in their conduct towards plaintiff the defendants were moved by malice; that they wished to damage him and deprive him of the means of livelihood.

Judgments against defendants, who as members in control of a union were found guilty of conspiracy to maliciously expel a member from a union, have been upheld in *Eschman v. Huebner*, 226 Ill. App. 537, where the facts are very much like those here. Eschman brought suit alleging a malicious conspiracy to expel him from the union and to lose his job; subsequently at a convention of the union plaintiff made an effort to bring about the election of a candidate opposing Huebner, but without success; this made Huebner angry and he made a threat to "get" Eschman; Eschman was subsequently expelled from the union and discharged from employment; he brought suit alleging this was accomplished through a malicious conspiracy and upon trial he had judgment. The court in its opinion summarized the situation by saying that officials of such a union "are liable in damages, if, in revenge against a member who opposes them, they maliciously proceed to trump up charges against him, and thus cause him to lose his employment and bring about his discharge by an employer who had no complaint against him." Similar cases are *Campbell v. Johnson*, 167 Fed. 102, and *Brennan v. United Hatters*, 73 N. J. L. 729. It is unnecessary to cite the many other cases to the same effect. The right to bring an action of malicious conspiracy such as that in the instant case has been so well established in many de-

cided cases that it is unnecessary to discuss this point at length.

Defendants say the verdict is excessive and was caused by prejudicial conduct on the part of the trial judge and plaintiff's attorney. The record shows that no such claims were made or argued on the hearing of the motion for a new trial. Neither do we find any objections made by defendants' counsel during the trial to any remarks by the trial judge or plaintiff's attorney.

Defendants attempt to make the point that by plaintiff's own admission he knew he was approximately eight weeks behind in making payment of his assessments. Plaintiff did make some remark which might be construed as an admission of this, but he later testified that he had checked the Borden records, which showed that he worked until May 21 when he was called home on account of the death of his mother-in-law and that he returned on June 5; that before he was called home he had paid the assessment for that week.

The verdict for $15,000 was not excessive considering the damages suffered by plaintiff. He was 45 years old when suspended; he had been a member of the union for about 24 years and always in the milk trade; after his suspension, although he has been reinstated, he has never been able to procure another job with another milk company; no dairy would hire him for fear the union might cause them trouble; he was earning a total of about $2,600 a year when he was suspended, although for a short time he had a political job with its uncertainties. At the suggestion of the trial court plaintiff remitted the verdict to $7,500. The jury had a right to give exemplary damages, and the amount to which the verdict was reduced would hardly compensate plaintiff for the actual damages sustained by him.

Complaint is made of some of the instructions given by the court, but these are without merit. It is said

18

plaintiff's instruction No. 5 assumes that defendants, or any one of them, wilfully or maliciously procured the discharge of plaintiff. The instruction is predicated upon a belief by the jury that a preponderance of the evidence so shows. The instruction does not say that the defendants were guilty of anything. Other instructions given at the request of plaintiff are criticized as containing implications that defendants were guilty of malice and plaintiff therefore entitled to exemplary damages. At the request of the defendants, instructions of a similar import were given—Nos. 16, 17 and 18. As was said in *Jacoby v. Stark*, 108 Ill. App. 630, the court might reasonably be led to believe when both sides submitted similar instructions as to malice or exemplary damages, that it was conceded to be a proper case for the consideration of these factors.

Plaintiff's pleadings were consistent and conformed to the proof and the evidence. Defendants argue that they were not guilty of a conspiracy. This was a question for the jury. In *Doremus v. Hennessy*, 62 Ill. App. 391, affirmed 176 Ill. 608 the court said that in such civil actions the conspiracy is not the gravamen of the charge but may be pleaded and proved in aggravation of the wrong of which the plaintiff complains and enable him to recover against all of the conspirators as joint tort feasors. Defendants went to trial upon all of the counts, including the additional count 3, which named James Kennedy only. The defendants were found guilty under counts 1 and 2. The verdict was manifestly supported by the evidence. All of the defendants were properly found guilty and, as there were no procedural errors appearing upon the trial, the judgment for $7,500 is affirmed.

*Affirmed.*

The foregoing opinion prepared by Mr. Justice Mc-Surely is hereby adopted as the opinion of the court, and judgment is entered in accordance therewith.

*Judgment affirmed.*

Matchett, P. J., and O'Connor, J.