**D. R. ALLEN, Appellant,**

v.

**INTERNATIONAL ALLIANCE OF THE-ATRICAL, STAGE EMPLOYEES AND MOVING PICTURE MACHINE OPER-ATORS OF the UNITED STATES AND CANADA, AFL–CIO, Appellee.**

No. 20648.

United States Court of Appeals
Fifth Circuit.

Oct. 23, 1964.

C. V. Stelzelmuller, Birmingham, Ala.,. Moore, Thomas, Taliaferro, Forman & Burr, Birmingham, Ala., of counsel for appellant.

Frank B. Murdoch, Philadelphia, Pa.,. Erle Pettus, Birmingham, Ala., Bancroft D. Haviland, Schnader, Harrison, Segal' & Lewis, Philadelphia, Pa., Rives, Peter-son, Pettus & Conway, Birmingham, Ala.,. for appellee.

Before RIVES, JONES, and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

In Anniston, Alabama, a small, tightly closed local union of motion picture operators sought to enforce its closed shop policy by harassing the plaintiff into quitting his job as a projectionist in a drive-in theatre. The plaintiff was a member at large of the parent union. Several times he had tried to join the Local but its exclusive membership turned him down. When the stubborn plaintiff refused to quit his job, the Local filed charges with the International that the plaintiff was in violation of a union rule compelling him, as a non-member of the Local, to leave the Local's jurisdiction when ordered to do so. The International obliged by expelling the plaintiff from its membership at large. That is the gist of it. Here are the details.

D. R. Allen, the plaintiff-appellant, brings this action under the Labor-Management Reporting and Disclosure Act of 1959 (the Landrum-Griffin Act), 29 U.S. C. §§ 411(a) (5) and 412.[1] The defend--

---

1. Section 411(a) (5) provides:
   "Safeguards against improper disciplinary action.—No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such or--

ants are the International Alliance of Theatrical Stage Employees and Motion Picture Machine Operators of the United States and Canada, AFL-CIO and its Anniston, Alabama, affiliate, Local 506, which has a collective bargaining agreement with Allen's employer. Since October 9, 1958, Allen has worked for the Midway Drive-In Theatre in Anniston. The complaint alleges that the International wrongfully expelled Allen from its membership at large and that both unions harassed him by attempting to force him to leave his job.

Allen, although a resident of Anniston, was a member of Local 793 in Huntsville, Alabama, until the International dissolved that union in 1957. Under the International's constitution, on dissolution of a local the members are eligible to become "members at large" in the International. Allen applied for such membership and was accepted. On several occasions he applied for membership in Local 506, which has jurisdiction over motion picture houses in Anniston. He still wants to be a member. Local 506, however, is a closed union.[2] Allen describes it as a "small exclusive club" ; the district court found that its membership is "restricted at the will, whim or caprice of its members". In 1958 its six members rejected Allen's application for member-

ship. Since then, Allen has done nothing to endear himself to the eight or nine members now constituting Local 506.

The constitution of the International union requires all local unions "to insist that all positions within their jurisdiction be filled by their own members", with next preference to members of other locals. The International asserts that the effect of this provision was suspended by a Special Bulletin issued in September 1958 and affirmed at its annual conventions, but the record is unclear on this point and there is no doubt that the provision was not repealed. The plaintiff insists that Local 506, carrying out the International's constitutional mandate, seeks to impose closed shop conditions on the Midway Theatre contrary to the Alabama Right-to-Work law. There is no doubt as to the Local's policy. The undisputed testimony of the owner of the Midway Theatre is that under his management, as under that of the previous owner, the theatre has an oral agreement, made with Gunn, the Local's business agent, to employ only projectionists who are members in good standing of Local 506. In October 1959, in line with this closed shop policy, Gunn asked Allen to quit his job so that the Local could give it to another projectionist, Hawkins, a member of the union.[3] At the trial Gunn

ganization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.

"(b) Any provision of the constitution and bylaws of any labor organization which is inconsistent with the provisions of this section shall be of no force or affect. Pub.L. 86–257, Title I, § 101, Sept. 14, 1959, 73 Stat. 522."

Section 412 provides:

"Civil action for infringement of rights; jurisdiction. Any person whose rights secured by the provisions of this subchapter have been infringed by any violation of this subchapter may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate. Any such action against a labor organization shall be brought in the district court of the United States for the district where the alleged violation occurred, or where

the principal office of such labor organization is located. Pub.L. 86–257, Title I, § 102, Sept. 14, 1959, 73 Stat. 523."

2. The Local's constitution gives employment preference to senior members; limits admission to senior memberships to junior members; limits admission to junior membership to sons of members; and requires a two-thirds vote for any new member to be admitted. In twenty years only two members were admitted to the union.

3. Both Hawkins and another projectionist, Guyer, along with Allen, had been members of the Huntsville local when they lived and worked in Anniston. Allen contends that the members of Local 506 had nothing against him; they were simply divided into two factions of three members each; each faction had a favorite. To break the deadlock the union took in both Hawkins and Guyer.

testified that he "figured" the members of his Local have a right to a job over anybody who is not a member; "that is what we have been doing all these years."

In spite of the pressure from the union, Allen declined to leave his job. Gunn then asked the employer to discharge Allen. The employer refused to discharge Allen. The Local put Hawkins on the job anyway. For thirty-two days Hawkins worked in the same projection room with Allen, his salary paid by the Local. According to the finding below, Hawkins interfered with Allen's duties by cutting off signalling devices and by tampering with adjustments of machines, as part of the union's plan to harass Allen into giving up his employment at the theatre.

February 24, 1960, at the Local's instance, the International wrote Allen ordering him to withdraw within two weeks from the jurisdiction of Local 506. Allen asserts that this order was an order "to get out of town." The International explains in its briefs that this "obligation was not physically to leave town but to cease doing work that otherwise would be done by members of Local 506." Within the context of this case, the distinction is unimpressive.

Still resistant to pressure, the plaintiff remained on his job. In April 1960 the Local filed a charge against Allen with the International. The charge, dated May 26, 1960, states:

"That the said D. R. Allen received a Registered letter, which was received and signed for him on 10 March, 1960, from Walter F. Diehl instructing him to withdraw from the jurisdiction of Local 506, Anniston, Alabama, and to the date of this

affidavit said D. R. Allen, *has failed. and refused to obey and comply with. said order to withdraw immediately,. pursuant to Article 21, Section 9,* of the Constitution and By-Laws of the I.A.T.S.E. & M.P.M.O. of the U.S.. and Canada, but is on this date working as an operator at the Midway Theatre, Anniston, Alabama." (Emphasis added.)

A representative of the International conducted two hearings on the case. At the first hearing, June 8, 1960, the charge was read into the record but neither the hearing officer nor Gunn, who conducted the prosecution, seemed to realize the limited nature of the offense with which Allen was charged. Instead, going far afield, Gunn spent considerable time showing that Allen had filed charges against Local 506 with the National Labor Relations Board.[4] Allen was not represented at this hearing. He made a short statement and left the hearing. This is his statement:

"I am not guilty as charged. This. language doesn't fit me. What they are trying to do here is illegal and against public policy. They have tried to bring about a lot of things to. cause me grief and trouble without. any knowledge of any cause on my behalf; and I say that this act is just another way to get around to cause me to lose my job. It seems that they asked for supplement (sic) and have no intention for anything else other than to destroy rather than to be constructive. I say again, I am not guilty as charged. This act. is against public policy and is illegal."

4. In an effort to hold on to his job, Allen filed charges with the NLRB and, later, with the International, that on December 6, 1958, Local 506 had only six "active resident" members and therefore, under the International Constitution, having fewer than seven members, the local automatically ceased to exist. The NLRB did not take jurisdiction because the volume of business at the Midway Theatre was below the minimum required for the exercise of its discre-

tionary business. The International acknowledged receipt of Allen's charges,. but took no action one way or the other.. The district court accepted the view that residence means "domicile" and found that the seventh member was "domiciled" in Anniston even though he was employed: at Cape Canaveral. Officers of the International testified, however, that "active resident" member meant no more. than a "dues paying" member.

After Allen left, Local 506 presented evidence showing that Allen was not a resident of Huntsville and was therefore not eligible for membership in Local 793, the Huntsville local. Gunn testified that when he put Allen on the job he told him that it would be a temporary job. The hearing officer wound up the hearing with the following question directed to Local 506's business agent:

> "You realize, of course, that you couldn't take Brother Allen off the job if the employer wanted him to stay."

To this Gunn replied, "That is right." Thereupon the hearing was adjourned *sine die.*

A second hearing was held August 24, 1960. The notice stated that the hearing was "reopened for the purpose of taking additional evidence in relation" to the charge filed against Allen. Taking a restricted view of the purposes of the second hearing, the examiner refused to hear Allen's reason for not withdrawing from the Local's jurisdiction; excluded testimony showing that Local 506 was no longer in existence (because of having fewer than seven members) and had lost its jurisdiction under the International Constitution; excluded testimony that the Local had arbitrarily denied the plaintiff admission to membership on two or three occasions; and refused to allow the plaintiff to impeach the credibility of one of the witnesses. Frustrated, Allen protested, "We can't get anything into the record, everything is overruled." At this hearing Allen was represented by a member of Local 506. Even if we allow for informalities and irregularities common in hearings of this nature, we must say that the large number of unexplained off-the-record discussions fogs the proceedings and makes it difficult to determine whether the plaintiff was given a fair chance to defend himself. At the close of the hearing, the examiner attempted to persuade Local 506 and Allen to settle their differences but the plaintiff was unwilling to give up his job and Local 506 would not settle on any other terms.

October 10, 1960, the hearing officer found the plaintiff "guilty as charged" and recommended that he be expelled from membership in the International. The president of the International approved the recommendation. Shortly thereafter, Allen's employer, apparently still respecting the oral closed shop agreement with Local 506, notified Allen that he was discharged because of his expulsion from the Union.[5] Later, when Allen threatened suit for violation of the Alabama Right-to-Work law the caught-in-the-middle employer rescinded the discharge.

The plaintiff appealed promptly to the International's General Executive Board. The plaintiff contended that (1) the order directing him to leave the jurisdiction of Local 506 was unlawful, an attempt to establish a closed shop in violation of the Alabama Right-to-Work law; [6] (2) Local 506 had no jurisdiction over Anniston because, under the International's Constitution, the local ceased to exist when its membership fell below seven; (3) the plaintiff was charged and tried under a section having no application to him; (4) there is no provision in the

---

5. The letter reads, in part:

"As you well know, I cannot depend on just one person to take care of our projection work at the Midway. This person might become ill and unable to perform his duties. From time to time we also have trouble that requires the aid of an additional projectionist.

"Mr. Allen, you have performed your work in an entirely satisfactory manner. If you were still a member of the union, I would be glad to continue employing you. I would also be glad to use you on the job in the future if you regain your union status. However, since you are no longer a member of the union, I am obliged to ask you to leave the job so that my needs can be fully protected."

6. Alabama Code, Title 26, § 375(1):

"§ 375(1). *Declaration of Policy.*—It is hereby declared to be the public policy of Alabama that the right of persons to work shall not be denied or abridged on account of membership or nonmembership in any labor union or labor organization. (1953, p. 536, § 1, appvd. Aug. 28, 1953.)"

International Constitution for an order to compel a member at large to withdraw and no procedure for disciplinary action against a member at large; (5) the plaintiff did not receive a fair trial. The Board dismissed the appeal in a brief opinion that discusses the broad power of the Board to discipline members at large but does meet the point that Allen was *charged* only with violation of Section 9 of Article 21.[7]

In the district court Allen sought the following relief:

(1) Reinstatement to membership on the grounds that (a) he was denied "a full and fair hearing"; and (b) the union rule on which his expulsion was based is unlawful, violative of the Alabama Right-to-Work law, and contrary to public policy as expressed in the Taft-Hartley Act and the common law;

(2) A declaratory judgment that members at large are entitled to the same voting rights as other members of the International;

(3) Injunctive relief against the defendants to enjoin them from "interfering" with his "rights and privileges of [union] membership or disciplining [him] without notice and a full and fair hearing by ordering him to leave town, by attempting to have him fired, or by other means";

(4) Punitive and compensatory damages.

The district court, sitting without a jury, found that the plaintiff had "a full and fair hearing" and (1) denied the prayer for reinstatement, (2) held against the plaintiff on his request for a declaratory judgment, (3) granted injunctive relief against the Local, but not against the International, and (4) gave judgment for the plaintiff against the

Local in the amount of $500 compensatory damages and $2000 punitive damages. The court found that Local 506, "insofar as it interfered with plaintiff's employment by attempting to have him fired and by interfering with the performance of his duties, constituted an attempt to perpetuate a closed shop in violation of the Alabama Right-to-Work law". The court held that the International did not interfere with Allen's employment and was not liable for the actions of the Local, because the Local acted beyond the "line and scope of its authority". The Local did not appeal. The International had no reason to appeal. The plaintiff appealed from that portion of the judgment which was in favor of the International.

## I.

■■■ It is questionable whether all of the plaintiff's grounds for relief can be considered federal claims over which a federal court would have jurisdiction in a non-diversity suit. The appellee has not raised this question, however. And there is no doubt that the plaintiff is properly in the federal courts on his claim that the expulsion hearing was lacking in procedural due process under the LMR DA. The facts underlying the plaintiff's claims are so closely related that it would seem a disservice to the administration of justice to sort out the federal claims and, at this point, tell the parties to try the case piecemeal. Here, recognition of pendent jurisdiction promotes judicial economy and furthers the federal policy established in the LMRDA of providing a forum for the protection of individuals from union discipline allegedly lacking in due process. Hurn v. Oursler, 1933, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148. See Strachman v. Palmer, 1 Cir. 1949, 177 F.2d 427, 12 A.L.R.2d 687; Wright,

---

7. On this point the Board held:
"Appellant claimed that Article Twenty-One, Section 9, of the International Constitution, empowering any local union of the Alliance to require its members to leave the jurisdiction of another local, does not permit the International to exercise the same discipline over Mem-

bers-at-large. The General Office held that the International does have this power under Article Nineteen, Section 25, which states that Members-at-Large 'shall be directly responsible to the General Office and *shall enjoy* all the privileges and perform all the duties *of members* of this Alliance'."

Federal Courts, § 19; Comment, Pendent Jurisdiction, 62 Col.L.Rev. 1018 (1962).

## II.

The appellee contends that the International has the power to use against a member at large the same order of withdrawal which Article 21, Section 9 authorizes a local to use against one of its regular members working in a sister local's jurisdiction. The sweet reasonableness this contention might have in a vacuum is lost when it is considered within the context of this case. Here we have Local 506, a closed union, attempting to perpetuate a closed shop by having the International order Allen (a pro-union man but black-balled by the local) to "withdraw" from the local's jurisdiction. The interaction of the constitutions of the Local and the International, the availability to the Local of disciplinary action by the International which has the effect of implementing the Local's closed shop policy, the stigma attached to expulsion from the International's membership, no matter where Allen "withdraws" to, make the rule, *as the appellee construes it,* a powerful weapon for enforcement of the local's unlawful labor monopoly. The appellant, more than willing to meet the appellee on this ground, makes a broad attack on the validity of the rule. He contends that it abridges Allen's right to work under Alabama law, violates the Taft-Hartley Act, offends public policy, and transgresses the Constitution of the United States.

The Court takes a more narrow view of the case. We do not reach the point that the union rule on which the expulsion was based was unlawful, because we hold that the plaintiff did not receive that full and fair hearing to which he was entitled under the Bill of Rights provisions of the Landrum-Griffin Act.

The charge against Allen was solely that he had failed to comply with Article 21, Section 9 of the International's constitution. This provision reads:

"Any member who refuses to withdraw immediately from the jurisdiction of a sister local when so ordered by the local union of which he is a member shall, upon being found guilty thereof, be subject to fine, suspension or expulsion."

This rule has no possible application to Allen: he was not a member of any local. The rule plainly applies to a regular member of Local A disobeying that Local's order to withdraw from the jurisdiction of Local B. And the International is not in a situation analogous to Local A.

It is true, however, that Allen *was* in violation of that part of Article 19, Section 25, which reads:

"Such members-at-large shall be confined to working in the community where the dissolved local union to which they formerly belonged was located unless they first obtained permission from the General Office to work under the jurisdiction of another local union."

The International's reference in its letter of February 24 to this section, as well as to Article 21, Section 9 would indicate that the violation of Article 19, Section 25 was one of two bases for the order of withdrawal and the subsequent expulsion of Allen. But Allen was not charged with violation of Article 19, Section 25. Fair play entitles an accused to rely on the written charge made against him in preparing his defense, limits the trial to proof in support of that charge, and bars his being found guilty of an offense with which he is not charged.

The hearing officer made no pretense of justifying the application of Article 21, Section 9 to the plaintiff. He found Allen "guilty as charged". The General Executive Board, probably aware of the problem but uncertain how to handle it, held that the General Office had the "power" to order Allen's withdrawal from Anniston under Article 19, Section 25. The provision quoted by the Board as pertinent simply states that members at large "shall be directly responsible to the General Office and shall enjoy all the privileges and perform all the duties of members of this Alliance." But there is no

duty on a member of the Alliance to withdraw from the jurisdiction of any local until ordered to do so by "the local union of which he is a member". The question is not one of finding "power" in the Board to bring proper charges against Allen. The question is whether Allen was in fact fairly charged with violation of Article 21, Section 9 and fairly found guilty of that offense.

The union rule apparently applicable to Allen, Article 19, Section 25, forbidding members at large going beyond the community where their defunct union was located, is entirely different from Article 19, Section 9. Section 9 of Article 19 applies to a member who has all the advantages of belonging to a live, functioning local; an individual member can rely on such a union for help in obtaining employment. It might not be unreasonable for an active union to order one of its members to come back within its jurisdiction—or suffer the consequences, defined without latitude as consisting of a "fine, expulsion or suspension". Section 25 of Article 19, on the other hand, applies to a member at large—in the labor field, a man without a country—a union man with no local union to help him find employment. No specific disciplinary action is provided for a violation of the rule by a member-at-large. Instead, the Constitution even allows a member at large to work in another jurisdiction, subject to the approval of the General Office.

We do not question the right of the International to discipline members at large. We suggest, however, that the absence of express provisions for disciplining members at large carries the implication that there is latitude in determining appropriate disciplinary measures. No one can say what might have been the result, had Allen been charged with the violation of which apparently he was guilty—working in a community other than the community where Local 793 was located. He had open to him the possibility of obtaining the General Board's permission to work in Anniston and he might have received lesser discipline than expulsion. Certainly, some of the evidence Allen offered, which was immaterial on the charge that he violated Section 9 of Article 19, might be material in its bearing on mitigation of his offense in violating Section 25 of Article 19. It is significant that Local 506 was a closed union. It is significant that the International had cautioned the Local against imposing closed shop conditions in Anniston. Considering these facts, it is fair to assume that the hearing examiner would have been more liberal in his rulings on the evidence and that the Executive Board would have been more receptive to arguments in Allen's favor—if Allen had been charged under the broad power of the International to discipline members at large rather than under the narrow (and inapplicable) language of Section 9 of Article 25.

█ It is well established that penal provisions in union constitutions must be strictly construed. In McCraw v. United Ass'n of Journey & App. of Plumbing etc., Inc., E.D.Tenn.1963, 216 F.Supp. 655, 662, a decision under the Landrum-Griffin Act, the Court pointed out: "In determining whether discipline was properly imposed * * * any ambiguity or uncertainty in the constitution must be construed against the union and in favor of the member, in accordance with well established principles of documentary construction." A provision that a specified officer shall have power to interpret the constitution cannot overcome the plain meaning of the language or the rule of strict judicial construction when applied in a penal context, or foreclose the courts from construing the constitution in accordance with that judicial rule of construction. Gonzales v. International Ass'n of Machinists, 1956, 142 Cal.App.2d 207, 298 P.2d 92, affirmed, 356 U.S. 617, 78 S.Ct. 923, 2 L.Ed.2d 1018.

██ We hold that a member of a union is deprived of a "full and fair hearing" when he is charged with violating a provision of the union constitution inapplicable to him and found "guilty as charged." "If the expulsion of appellant is wrongful, he has remained a member

in good standing of the Union and has unlawfully been deprived of some of the rights afforded to him by the 'Act,' and is entitled to some *relief.*" *Addison v. Grand Lodge of International Ass'n of Machinists,* 9 Cir. 1963, 318 F.2d 504, 508.

In reaching this conclusion we have weighed the sound reluctance of courts to interfere in internal union affairs against the clear intent of Congress in LMRDA that we must overcome our reluctance when it appears that union disciplinary measures lack fundamental fairness. As the Court observed in *Vars v. International Brotherhood of Boilermakers,* 2 Cir. 1963, 320 F.2d 576, 578:

"Both parties agree that in an action of this kind, judicial review of the findings of the Union tribunal is limited in nature. * * * However, implicit in the requirement of a full and fair hearing is the requirement that there be some evidence to support the charges made. Cf. *Madden v. Atkins,* 4 N.Y.2d 283, 174 N.Y.S. 2d 633, 151 N.E.2d 73, 74 A.L.R.2d 772 (1958). If Section 101(5) is to provide any measure of protection for the individual union member who finds himself beseiged by the full power of the International Union, some review is necessary in order to protect such members from obvious abuses. This is especially true in cases such as this where the hearing examiner is not an independent figure divorced from union controversies but is an officer of the International Union. Thus, although the courts may be without power to review matters of credibility or of strict weight of the evidence, a close reading of the record is justified to insure that the findings are not without any foundation in the evidence."

On the expulsion issue, the case is reversed and remanded with instructions that the district court enter an order directing the International to reinstate Allen as a member at large. This holding is without prejudice to the International to hear proper charges against Allen for any violation of its Constitution and By-Laws and take appropriate disciplinary action against him.

III.

A. The district court held that the International was not liable for the acts of Local 506:

"The evidence, however, is clear that the International has made no attempt to enforce these 'closed shop' provisions in right to work states, including Alabama. On the contrary, they specifically instructed the Local not to interfere with plaintiff's employment. The Court finds that the International neither participated, acquiesced in, nor ratified any attempt to interfere with plaintiff's employment at the Midway Drive-In Theatre."

With deference, we disagree with the able district judge. The International was well aware that the Local harassed Allen in order to force him to quit his job, and that this was done as part of the Local's determination to impose closed shop conditions on Allen's employer. The International's expulsion of Allen directly furthered this unlawful interference with Allen's employment. The Local had no disciplinary power over Allen; it had to resort to the International for enforcement of its ultimatum to Allen. To make matters worse for any non-member of Local 506, the Local was a closed union in accordance with its Constitution, which was approved by the International. The International, and everyone else, understands the consequences of combining a closed union with a closed shop. Section 16 of Article XIX expressly required its locals to enforce a closed shop policy, and although the record is not clear as to whether the effect of that provision is now suspended, the provision has never been repealed. In these circumstances, and taking the record as a whole, we consider that the International was a participant in the unlawful interference with the plaintiff's employment and is therefore jointly liable with Local 506.

B. Even if the International should not be considered as a participant with Local 506 in the unlawful interference with Allen's employment, the International is liable for the acts of the Local under the doctrine of respondeat superior. The Alabama position on the liability of a principal for the tort of its agents follows classic lines of agency liability: "The principal is responsible for the acts of his agents done within the scope of his employment, and in the accomplishment of the objects within the line of his duties, though the agent seek to accomplish the master's business by improper or unlawful means, or in a way not authorized by the master, unknown to him, or even contrary to his express direction." Supreme Lodge of World Loyal Order of Moose v. Kenny, 1916, 198 Ala. 332, 339, 73 So. 519, 522. See also National Order of Mosiac Templars of America v. Bell, 1926, 21 Ala.App. 401, 108 So. 636. Cf. Restatement (Second), Agency § 230.

This principle applies to a local union and the parent association of which it is a part. In Grand International Brotherhood of Locomotive Engineers v. Green, 1923, 210 Ala. 496, 499, 98 So. 569, 572, error dismissed, 1924, 265 U.S. 576, 44 S.Ct. 636, 68 L.Ed. 1187; 74 A.L.R.2d 799, also a case of expulsion and interference with employment, the Supreme Court of Alabama stated the principle as follows:

"It is also suggested that the Grand International Brotherhood should not be held answerable for what was done by the local branch at Selma in the absence of averment, and proof that the parent organization actually participated in or ratified plaintiff's expulsion. That is precisely what the act intends to accomplish * *. Its effect is that *the privilege of association must be accepted with the burden of liability for the acts of local branches * * *.*"

Other states have followed Alabama's lead. Thus, in International Printing Pressman & Assistants' Union of North America v. Smith, 1946, 145 Tex. 399, 198 S.W.2d 729, citing Green, Bell, and Kenny, the court said:

"It is generally held that a parent organization, such as the international union here under consideration, is liable for the wrongful acts of one of its local organizations and its officers done in the line and scope of their duties as agents of the parent organization. * * *

"It is true the trial court found in its judgment that there was no showing that the subordinate union was the agent or representative of the international union, but we think this was established conclusively by the constitution and by-laws of the parent organization. It is also true the jury failed to find that the local union acted on instructions from the international organization. But this is not material. Under the above authorities, since the subordinate union and its secretary were the agents of the international union, acting within the scope of their authority, the international union is responsible for their wrongful conduct, even though the international union had no actual knowledge of their actions and did not direct them in the performance thereof. See also Clarkson v. Laiblan, 202 Mo.App. 682, 216 S.W. 1029.

"Under the rule above announced, the international union is liable for the conduct of the subordinate union and its officers in the line of their duty, even though the international union did not thereafter ratify such acts. * * * *"

In short, lack of participation or acquiescence or ratification are not relevant on the issue of the principal's liability. The principal cannot escape liability for the torts of an agent by telling the agent to act lawfully. Restatement (Second), Agency § 230. The criterion is whether the agent (the local union) is acting within the line or scope of the Local's duty: "the privilege of association must be accepted with the burden of

liability for the acts of local branches". 98 So. at 572.

As emphasized, the Local had no supervisory jurisdiction over Allen; he was subject to discipline by the International. The International's constitution required all affiliated locals "to insist that all positions within their jurisdiction be filled by their own members," with next preference to members of other locals. Since the Local was effectuating this policy (although it went further in its efforts than state law permitted), it would seem that the Local was acting within the scope of its duties. Compare National Order of Mosaic Templars of America v. Bell, 1926, 21 Ala.App. 401, 108 So. 636, 638 (local lodge had duty to collect dues, but did so maliciously). The International's knowledge of the Local's harassment of Allen, its knowledge that Local 506 had ordered Allen to withdraw from its jurisdiction under authority of the International's supervisory power over Allen, the International's close relationship with the Local on every aspect of the dispute between Allen and Local 506, all show that the International regarded the Local's actions against Allen as within the scope of its authority—in spite of the Special Bulletin's lip service to the Alabama Right-to-Work law. We hold that the district court erred in failing to find that the Local was acting for its principal within the line and scope of its agency.

## IV.

The plaintiff argues that under the Bill of Rights provision of the Landrum-Griffin Act, 29 U.S.C. § 411(a) (1),[8] he is entitled to a declaratory judgment that members-at-large have the right to nominate candidates, to vote in elections or referendums, and to attend membership meetings. We affirm the district court's holding on this issue. When the structure of the International is consid-

ered, the status of "member at large" is not at all contradictory to the Act.

\* \* \*

We find it unnecessary to discuss the appellant's other contentions. In reaching a decision in this matter, however, the Court has made a full-case review of the record and has considered all of the contentions asserted in the parties' five briefs and two post-argument letters.

The judgment below is affirmed in part and reversed in part and remanded for proceedings consistent with this opinion.

8. Section 411(a) (1) reads:
"Equal rights.—Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor or-

ganization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and by-laws.'